UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**GARY E. BAUMBACH**,                    Case Number 3:12 CV 2860

Plaintiff,                                              Judge James G. Carr

      v.                                              REPORT AND RECOMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

Defendant.                                          Magistrate Judge James R. Knepp, II

## INTRODUCTION

Plaintiff Gary E. Baumbach seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405 (g) and § 1383 (c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2 (b)(1). (Non-document entry dated November 16, 2012). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL HISTORY

On September 25, 2008, Plaintiff filed an application for DIB claiming he was disabled due to bipolar disorder, major depression, and vision loss in his right eye. (Tr. 148, 141). He alleged a disability onset date of October 1, 2001, and his date last insured for disability benefits (DLI) was December 31, 2006. (Tr. 141). His claim was denied initially and on reconsideration. (Tr. 90-92, 96-102). At Plaintiff's request, a hearing was held before an administrative law judge (ALJ). (Tr. 19, 36). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 19-35). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On November 16, 2012, Plaintiff filed the instant case. (Doc. 1).

FACTUAL BACKGROUND

*Plaintiff's Vocational and Personal Background*

Born December 19, 1948, Plaintiff was 58 years old at the time of the ALJ hearing on August 22, 2011. (Tr. 19, 148). He earned a Bachelor of Science degree in geology from Capital University in 1971 and completed post-graduate coursework at Pennsylvania State University, where he studied recycling and hydraulic engineering. (Tr. 39, 225). Previously, Plaintiff worked as a hydrologic engineer, computer technician, sales associate, and small business partner. (Tr. 51, 158, 213, 225-26).

Plaintiff lived with his parents until his father died in 2006, and then continued to live with his mother. (Tr. 46-48, 273). With respect to daily activities, Plaintiff took care of his elderly mother, drove his mother to museums and doctor appointments, read, studied on the computer, created a genealogy report, exercised, cooked, grocery shopped, mowed the lawn, gardened, performed yard work and home maintenance, attended church and family birthday parties, watched television, managed his finances, and maintained personal hygiene. (Tr. 47-49, 53-54, 185-92, 225, 236-37, 245, 254, 263, 265, 267, 273, 334, 432). Plaintiff testified depression and side effects from his medication adversely affected his reading comprehension and the scope of his daily activities. (Tr. 47-49, 53, 55).

*Medical Impairments*

From February 26, 2001 through December 14, 2006, Plaintiff treated with psychiatrist Agha Shahid, M.D. (Tr. 256-276). Dr. Shahid consistently indicated Plaintiff felt better with medication, had a stable or improved mood and affect, slept well, had a normal appetite, and

denied suicidal or homicidal thoughts. (Tr. 258, 260-61, 263, 266-67, 273). Dr. Shahid regularly reported Plaintiff did not experience side effects from medication. (Tr. 257, 260, 262, 264, 266-68, 271, 273). However, at times Plaintiff complained of fatigue, irritability, reduced appetite, and feeling "low". (Tr. 257-58, 260-61, 264, 275). Dr. Shahid prescribed Prozac. (Tr. 258). Initially, Plaintiff reported no side effects from the medication, but later stopped taking the drug on his own. (Tr. 275, 276). Dr. Shahid continued to prescribe Prozac, despite Plaintiff's claims the drug was no longer of benefit. (Tr. 276).

Beginning on August 16, 2001 and continuing through September 9, 2009, Plaintiff saw Sydney O. Fernandes, M.D., for reasons generally immaterial to the instant matter. (Tr. 347). However, on November 27, 2006, Dr. Fernandes reported Plaintiff had stopped taking Prozac because it made him feel angry and irritable. (Tr. 341). On December 18, 2006, Plaintiff resumed Prozac, and indicated he felt better. (Tr. 340). Throughout the record, Dr. Fernandes described Plaintiff as morose, tense, quiet, monotone, and dazed. (Tr. 337-38, 340). On August 21, 2007, Plaintiff told Dr. Fernandes his medications were still being adjusted and reported general fatigue and depressive feelings. (Tr. 338).

On January 9, 2007, Plaintiff was examined at Behavioral Connections of Wood County (BC). (Tr. 443). The examiner reported Plaintiff had a flat affect and a lengthy history of depression. (Tr. 442). He or she noted Plaintiff felt angry and had trouble with memory, concentration, and focus. (Tr. 442). Plaintiff expressed dissatisfaction with Dr. Shahid's treatment and reported problems with sleeping, appetite, and motivation. (Tr. 442). The examiner diagnosed major depressive disorder-recurrent. (Tr. 443).

On January 18, 2007, Dr. Molitar completed an initial psychiatric evaluation for BC. (Tr. 438). He reviewed Plaintiff's December 14, 2006 questionnaire and January 9, 2007 diagnostic

assessment, assigned Plaintiff a global assessment of functioning (GAF) score of 40, and diagnosed bipolar disorder, type II.[1] (Tr. 439-40).

Plaintiff returned to Dr. Molitar approximately one month later, at which time Dr. Molitar indicated Plaintiff's mood was slightly depressed and irritable, his affect was restricted, and his behavior, thought process, and appearance were unremarkable. (Tr. 437). Dr. Molitar recommended Plaintiff increase Lamictal and decrease Prozac dosages. (Tr. 437).

Plaintiff had several sporadic follow up visits with Dr. Molitar through October 5, 2007, where Dr. Molitar consistently diagnosed bipolar disorder, type II and adjusted Plaintiff's medications. (Tr. 433-36). At these visits, Plaintiff's affect varied from restricted to broad, his mood varied from improved and stable to very depressed, and his behavior varied from anxious to talkative. (Tr. 433-36). Plaintiff consistently had odd or bizarre ideas. (Tr. 433-36).

On November 16, 2007, Plaintiff complained he was more depressed because winter months were "hard" for him, he had trouble focusing, and felt agitated. (Tr. 432). Plaintiff indicated to Dr. Molitar that he was unsure about Cymbalta and thought Prozac may have been better. (Tr. 432).

On January 30, 2008, Plaintiff came under the care of Galina Zhurakovski, M.D., at BC. (Tr. 431). Dr. Zhurakovski consistently diagnosed Plaintiff with bipolar disorder, type II and adjusted his medications. (Tr. 238-55, 427, 431).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id*. at 34.

On February 27, 2008, Dr. Zhurakovski conducted a psychiatric evaluation. (Tr. 253). Dr. Zhurakovski reported Plaintiff continued to experience mood swings, but denied problems with sleep and appetite. (Tr. 253). Plaintiff complained of poor memory and slow concentration but felt his medication was helpful. (Tr. 253). Plaintiff stated he had experienced mood swings since he was a teenager and had taken Prozac for twenty years, or until the doctors at BC switched him to Lamictal and Cymbalta. (Tr. 253). Dr. Zhurakovski's mental status examination was unremarkable. (Tr. 254).

Throughout the course of several follow up visits, Plaintiff generally complained of fatigue, mood swings, poor memory, poor focus, agitation, and trouble sleeping (Tr. 236-37, 246-50, 253, 297-98, 301, 303, 427), but routinely indicated medication and exercise helped him feel better overall (Tr. 236-37, 245-46, 250-51, 297-98, 301, 303, 305-06, 308-09). Occasionally, Plaintiff felt angry regarding lost time, missed opportunities, and inability to develop meaningful relationships with others. (Tr. 236, 301, 308). He also complained of lost appetite, but after medication adjustments, Plaintiff indicated he was able to sleep and eat better. (Tr. 297-98). At times, Dr. Zhurakovski observed Plaintiff's mood was slightly depressed and he was "emotionally colorless". (Tr. 237, 250, 252, 300). At other times, he was positive, calm, descriptive, informative, and animated, with a normal mood and appropriate affect. (Tr. 251, 297, 305-07).

On July 8, 2009, Plaintiff complained of tremors in his hands, left arm, and left shoulder, but they ended after Dr. Zhurakovski adjusted his medication. (Tr. 307). On October 22, 2009, Plaintiff experienced tremors again, this time in his cheeks. (Tr. 298). Once more, Dr. Zhurakovski adjusted Plaintiff's medication and the tremors ceased. (Tr. 298).

On July 29, 2009, Plaintiff had an eye examination which revealed cataracts in both eyes. (Tr. 233). Plaintiff wore glasses and had good vision in his left eye, but due to a work injury, had significant vision problems in his right eye. (Tr. 233, 278).

In September, 2009, Plaintiff underwent a vocational evaluation administered by W.J. Timmerman, Ph.D., CRC, DAPA, at the Bureau of Vocational Rehabilitation. (Tr. 224). Plaintiff complained of depression and told Dr. Timmerman it had "ruined his life." (Tr. 225). He provided Dr. Timmerman with his medical history, including his drug regimen and right eye injury, and explained he had trouble concentrating during testing. (Tr. 225). As a worker, Plaintiff rated himself as a five (out of five) regarding ability to arrive to work on time and get along with co-workers, a four (out of five) regarding ability to get along with supervisors, and a three (out of five) regarding ability to keep his mind on his work and be productive. (Tr. 229).

Dr. Timmerman administered several tests, which generally showed Plaintiff had normal to above average intelligence, yet had trouble with concentration and social skills. (Tr. 229-30). Dr. Timmerman concluded Plaintiff possessed the intellectual capability for further formal learning but questioned his mental-emotional state. (Tr. 231). He recommended Plaintiff attend career exploration programs, re-evaluate his mental health treatment program, and focus on anger issues at his psychotherapy or counseling sessions. (Tr. 230). If interested in immediate employment, Dr. Timmerman opined Plaintiff could work as a pharmacy assistant, security guard, counter clerk/night auditor, or bookkeeper/auditing clerk. (Tr. 232).

On November 5, 2009, Plaintiff's mother, Rosalie Baumbach, completed a pain questionnaire/report and a function report. (Tr. 179-191). She described Plaintiff's symptoms as "sadness, worthlessness, irritability, hopelessness, memory problems, inability to think and concentrate or make decisions, physical aches and pains, slow physical movements, and

slowness in completing tasks, fatigue." (Tr. 179, 183). She indicated in addition to medicine, physical exercise and therapy relieved Plaintiff's symptoms. (Tr. 182).

On November 25, 2009, Dr. Zhurakovski completed a mental status evaluation for the Bureau of Disability Determination. (Tr. 292). She reported first seeing Plaintiff on January 16, 2008 and noted Plaintiff's appearance was appropriate, but he provided "slow" answers and used a soft voice. (Tr. 292). Although she indicated he was capable of remembering, understanding, and following directions, she noted Plaintiff had severely limited executive functioning skills, low level of motivation and energy, dysphonic mood, reserved affect, difficulty concentrating, and persistent psychomotor retardation. (Tr. 292-93). Dr. Zhurakovski indicated Plaintiff only communicated with his relatives, could not take any pressure in a work setting, and had no motivation to perform simple and routine, or repetitive tasks. (Tr. 293). She diagnosed bipolar disorder, type II. (Tr. 293).

Plaintiff continued to see Dr. Zhurakovski approximately every two weeks from June 23, 2010 through February 1, 2011, although the corresponding treatment records are not provided. (Tr. 210).

In February, 2011, Dr. Zhurakovski filled out a psychiatrist evaluation and opinion. (Tr. 413). She indicated Plaintiff had been treated at BC from December 14, 2006 through February 1, 2011. (Tr. 413). At the time of his initial evaluation, in late 2006 or early 2007, Dr. Zhurakovski indicated Plaintiff was moderately limited[2] in his abilities to understand, remember and carryout short simple instructions, use judgment for simple work-related decisions, follow work rules, behave in an emotionally stable manner, interact appropriately with the public, supervisors, or co-workers, respond appropriately to work stresses in a usual work setting, and

---

2. Moderate Loss was defined as "[s]ome loss of ability in the named activity but can sustain performance for 1/3 up to 2/3 of an 8-hour workday." (Tr. 413).

respond appropriately to changes in a routine work setting. (Tr. 413-14). He was markedly limited[3] in his abilities to understand, remember, and carryout detailed instructions and relate predictably in social situations. (Tr. 413). She reported Plaintiff had between a slight[4] and moderate limitation in his ability to maintain personal appearance. (Tr. 414). Dr. Zhurakovski anticipated Plaintiff would be reasonably expected to miss five or more workdays per month due to his impairments. (Tr. 414).

At the time of the evaluation, in February 2011, Dr. Zhurakovski opined Plaintiff was moderately limited in his abilities to maintain personal appearance, interact appropriately with the public, supervisors, and co-workers, and understand, remember, and carryout short, simple instructions. (Tr. 414-15). She found him markedly limited in abilities to behave in an emotionally stable manner, relate predictably in social situations, understand, remember, and carryout detailed instructions, use judgment for simple, work-related decisions, and follow work rules. (Tr. 414-15). He was between markedly and extremely limited in his ability to respond appropriately to work stresses in a usual setting and extremely limited[5] in his ability to respond appropriately to changes in a routine work setting. (Tr. 415). Again, she reasonably expected Plaintiff to be absent five workdays per month due to his impairment. (Tr. 415). Dr. Zhurakovski assigned Plaintiff a GAF score between 46 and 48 in 2007 and a score of 50 in 2008, 2009, 2010, and 2011.[6] (Tr. 415).

---

3. Marked Loss was defined as "[s]ubstantial loss of ability in the named activity; can sustain performance only up to 1/3 of an 8-hour workday." (Tr. 413).
4. Slight Loss was defined as "[c]an sustain performance for 2/3 or more of an eight-hour workday." (Tr. 413).
5. Extreme Loss was defined as a "[c]omplete loss of ability in the named activity." (Tr. 413).
6. A GAF score of 41-50 reflects serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *DSM-IV-TR,* at 34.

On February 4, 2011, Dr. Zhurakovski submitted a narrative report in support of Plaintiff's application for DIB. (Tr. 412). She wrote that despite having a history of mood disorder from an early age and its crippling effect on him, Plaintiff "was able to attend college and have meaningful jobs." (Tr. 412). "[H]is past medication trials," she continued, "can encompass the whole course of psychopharmacology, yet none of the treatments brought him any relief." (Tr. 412). She urged the reader to find Plaintiff disabled. (Tr. 412).

*Disability Related Development*

Melanie Bergsten, Ph.D., performed a psychiatric review on December 21, 2009. (Tr. 388). She concluded Plaintiff's bipolar disorder and depression did not precisely satisfy the diagnostic criteria of listing 12.04. (Tr. 391). Dr. Bergsten found insufficient evidence to assess the "B" criteria of listing 12.04 and concluded evidence did not establish the presence of "C" criteria. (Tr. 398-99). She noted there was insufficient evidence to establish the severity of Plaintiff's impairment during the relevant period, from the alleged onset date of October 1, 2001 through the DLI of December 31, 2006. (Tr. 400). On April 20, 2010, Frank Orosz, Ph.D. found insufficient evidence of bipolar disorder and depression during the relevant time period and affirmed Dr. Bergsten's assessment. (Tr. 410).

Elizabeth Das, M.D., conducted a residual functioning capacity (RFC) assessment on January 26, 2010, where she found Plaintiff had no exertional limitations. (Tr. 402-03). With respect to nonexertional limitations, she concluded Plaintiff could never use ladders, ropes, or scaffolds and found limitations with near and far acuity, depth perception, accommodation, color vision, and field of vision due to right eye blindness. (Tr. 403-05). She opined Plaintiff had no communicative limitations but should avoid hazards such as machinery and heights. (Tr. 406). On May 4, 2010, Paul Morton, M.D., affirmed Dr. Das' RFC assessment. (Tr. 411).

***ALJ Decision***

On August 11, 2011, the ALJ determined Plaintiff had the following severe impairments: bipolar disorder; depression; legally blind in right eye; and cataracts with 20/20 correctable vision in left eye. (Tr. 24). The ALJ found these impairments did not meet or medically equal a listed impairment. (Tr. 25-26).

The ALJ determined Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with several nonexertional limitations related to climbing, exposure to moving machinery and unprotected heights, vision impairments, pace, production, simple and routine tasks, work place changes, and interaction with the public, coworkers, and supervisors. (Tr. 26). Based on VE testimony, the ALJ concluded Plaintiff could perform work as an automobile retailer, a floor waxer, and an industrial cleaner. (Tr. 30).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the

ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can he perform past relevant work?

5. Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if he satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)–(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Claiming the Commissioner's decision should be reversed or remanded, Plaintiff makes the following arguments: 1) the ALJ erred by determining he did not meet listed impairment 12.04; 2) the ALJ erred by not calling a medical expert to provide an updated opinion; 3) the ALJ erred in assessing Plaintiff's credibility; 4) the ALJ failed to properly apply the treating physician rule; and 5) the ALJ improperly relied on the VE's testimony at step five. (Doc. 10). Each argument is addressed below.

### Listing 12.04

Plaintiff maintains his impairments meet or equal listing 12.04, and therefore, the ALJ erred in finding they did not. (Doc. 10, at 11-14).

The listing of impairments is used to determine whether a claimant's impairments meet or equal a particular listing. If a claimant meets the requirements of a listed impairment, then the claimant is considered disabled. 20 C.F.R. §§ 404.1520(d). If not, the sequential evaluation process continues and the ALJ must determine whether a claimant's impairment or combination of impairments is the "medical equivalence" of a listed impairment. *Id*. An impairment is equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). In order to determine whether a claimant's impairments are medically equivalent to a listing, the ALJ may consider all evidence in a claimant's record. 20 C.F.R. §§ 404.1526(c).

In order to establish disability due to a mental impairment on the basis of medical evidence, a claimant must satisfy one of the nine diagnostic categories for mental impairments contained in 20 C.F.R., Part 404, Subpt. P, App. 1, § 12.00. *Abbott v. Sullivan*, 905 F. 2d 918, 923 (6th Cir. 1990). Most of the listings impose two requirements: first that the claimant has

12

particular signs or symptoms; and second, the symptoms result in a specified degree of functional limitation. *Abbott*, 905 F. 2d at 923. The symptoms are found in paragraph A for each listing and, hence, are referred to as "paragraph A criteria". *Id*. The "set of impairment-related functional limitations" are contained in paragraph B of the listings and are referred to as "paragraph B criteria". App. 1, § 12.00. Here, Plaintiff asserts he satisfies the criteria of listing 12.04, specifically bipolar disorder and depression. *See* App. 1, § 12.04.

There are additional functional criteria in paragraph C for listing impairment 12.04. App. 1, § 12.00. However, "paragraph C criteria" are assessed only if paragraph B criteria are not satisfied. *Id*. A claimant has a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied. *Id*.

Paragraph B criteria for listing 12.04 require that two of the following restrictions exist in order for disability to be found at this stage: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or, repeated episodes of decompensation, each of extended duration. 20 C.F.R., Part 404, Subpt. P, App. 1, § 12.04. In order to meet Paragraph C criteria, a claimant must prove: repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or, a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *Id*.

Here, after considering the paragraph B criteria, the ALJ found Plaintiff had a mild restriction in his activities of daily living. (Tr. 25). Next, the ALJ concluded Plaintiff had

moderate difficulties in social functioning. (Tr. 25). With regard to concentration, persistence, or pace, the ALJ determined the Plaintiff had moderate difficulties. (Tr. 25). Finally, the ALJ found no evidence of decompensation. (Tr. 25). As a result, the ALJ determined Plaintiff failed to meet any of the paragraph B criteria.

Plaintiff claims the ALJ should have found marked limitations in his activities of daily living. (Doc. 10, at 12). As support, Plaintiff suggests the ALJ did not account for the fact that depression limited the frequency of his activities and she mischaracterized the scope of his daily activities. (Doc. 10, at 12). For example, Plaintiff claims that cooking only involved making sandwiches and canned or frozen foods. (Doc. 10, at 12).

However, the record shows Plaintiff participated a wide range of daily activities, such as taking care of his elderly mother, driving his mother to museums and doctor appointments, reading, studying on the computer, creating a genealogy report, exercising, cooking, grocery shopping, mowing the lawn, performing yard work and home maintenance, attending church and family birthday parties, gardening, watching television, managing his finances, and maintaining personal hygiene. (Tr. 47-49, 53-54, 185-92, 225, 236-37, 245, 254, 263, 265, 267, 273, 334, 432). The ALJ expressly acknowledged Plaintiff "had difficulty concentrating and being persistent in his daily activities", and she issued a mild restriction in this area despite the number of daily activities Plaintiff was able to perform. (Tr. 25). Therefore, the ALJ's determination with respect to daily activities is supported by substantial evidence.

Plaintiff further claims the ALJ should have determined he had marked limitations in social functioning because he had a history of avoiding interpersonal relationships, only spoke to his mother, and lacked interest in social activities. (Doc. 10, at 13). However, the record also supports the ALJ's determination with respect to Plaintiff's limitations in social functioning.

14

Plaintiff testified he left the house approximately twice a week, where he attended family birthday parties and church. (Tr. 48). He also self-rated his ability to get along with co-workers and supervisors as five (out of five) and four (out of five), respectively. (Tr. 229). Throughout Plaintiff's course of treatment with Dr. Zhurakovski, he appeared positive, calm, and animated, with a normal mood and appropriate affect. (Tr. 251, 297, 305-07). However, there is also evidence that he had difficulty being around other people and interacting with coworkers. (Tr. 225, 231, 293). Therefore, based on the record as a whole, the ALJ's finding that Plaintiff had moderate limitations in social functioning is supported by substantial evidence.

Finally, Plaintiff claims he had marked limitations with regard to concentration, persistence, or pace. (Doc. 10, at 13). Although Plaintiff had difficulties completing tasks, the record showed he was able to manage his finances, work on the computer, and assist his parents, including ensuring his mother got to her appointments on time. (Tr. 47-49, 53-54, 225, 263, 265, 407). Moreover, despite claiming to have suffered from depression since he was young, he was able to earn a college degree and have meaningful jobs during that time. (Tr. 412). On the other hand, Dr. Timmerman's opinion contains reports that Plaintiff "showed obvious signs of difficulty concentrating especially during timed tests". (Tr. 231). The ALJ considered such evidence in light of the record as a whole and determined Plaintiff's abilities were indeed moderately limited. (Tr. 25). Therefore, the record supports the ALJ's finding that Plaintiff had moderate limitations in concentration, persistence, or pace.

The fact that there may be substantial evidence in the record to support another conclusion is irrelevant. *Walters*, 127 F.3d at 532. The key inquiry on review is whether the ALJ's determination is supported by substantial evidence. *Id*. For the above stated reasons, the undersigned finds the ALJ's determination with respect to step three is supported by substantial

evidence, as Plaintiff has failed to satisfy either the paragraph B or paragraph C criteria[7] of listing 12.04.

***Medical Expert Testimony***

Plaintiff challenges the ALJ's decision not to call a medical expert to testify whether Plaintiff's impairments meet or equal listing 12.04. (Doc. 10, at 10-11). Without support, he argues evidence submitted after the state agency examiners issued their opinions would have changed their conclusion, effectively raising Social Security Ruling (SSR) 96-6p, 1996 WL 274180. (Doc. 10, at 11).

Generally, the ALJ is required to rely on some expert opinion evidence of record to make a disability determination. *Retka v. Comm'r of Soc. Sec.*, 1995 WL 697215, at *2 (6th Cir. 1995). Usually, at step three, this requirement is satisfied with the signature of a medical or psychological consultant on a disability determination form, which "ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review". SSR 96-6p, 1996 WL 274180, at *3.

However, the ALJ must call on a medical expert to give an updated medical opinion as to equivalence in two circumstances: (1) when the ALJ, after reviewing the evidence of symptoms, signs, and findings, is inclined to conclude the plaintiff's condition may be equivalent to the listings; or (2) after reviewing additional medical evidence, the ALJ determines new evidence may change the state agency medical or psychological consultant's finding that the plaintiff's impairments do not equal a listing. *Long v. Astrue*, 2011 WL 1258407, at *17 (M.D. Tenn. 2011) (citing *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 830-31 (6th Cir. 2009)); *Mills v. Comm'r*

---

7. Plaintiff puts forth no argument that he was able to satisfy the "C" criteria of listing 12.04.

*of Soc. Sec.*, 2012 WL 1715042, at *7 (S.D. Ohio 2012); SSR 96-6p, 1996 WL 274180, at *3-4.

In regard to the second exception, the Sixth Circuit has held:

> There will always be a gap between the time the agency experts review the record and give their opinion with respect to the Listing and the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of judicial remand.

*Kelly*, 314 F. App'x at 831 (finding evidence submitted after the state agency assessment did not fatally undermine the accuracy of that assessment and thus there was no need for the ALJ to obtain an updated medical expert opinion).

Here, the ALJ considered all medical opinions timely provided to her, which included Dr. Zhurakovski's 2011 opinion and the state agency examiner's opinions. (Tr. 26-28). Plaintiff argues additional evidence submitted after the state agency examiners issued their opinions may have changed their findings, thus directing the undersigned to the second SSR 96-6p exception. (Doc. 10, at 10-11).

Review of the state agency examiners' opinions reveals they found insufficient evidence from the relevant time period, or before Plaintiff's DLI, to assess the severity of his impairments. (Doc. 10, at 11); (Tr. 391-400, 402-06). The evidence, which Plaintiff argues would change the state examiner's opinion, is dated well after Plaintiff's DLI and accordingly would have had no effect on their opinions. *See* (Tr. 412-443).

Moreover, a signed disability determination, not a disability determination which found enough evidence during the relevant time period to make a determination, is all the regulations require. SSR 96-6p, 1996 WL 274180, at *3. Lastly, there was nothing novel or medically complex contained in the subsequent evidence, and there is no reason to suspect the ALJ would have had trouble interpreting the information contained therein. *Richardson v. Perales*, 402 U.S.

389, 408 (1971) (a medical expert "is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner."). Plaintiff raises no relevant medical evidence that would have necessitated medical expert testimony.

In light of the foregoing, the undersigned recommends finding the ALJ, having properly relied on and weighed the medical opinions in the record before her, acted within her discretion not to call a medical expert.

*Credibility*

Plaintiff argues the ALJ erred in her credibility determination by improperly relying on Plaintiff's alleged noncompliance with prescribed treatment, emphasizing that most of the treatment records were from after his DLI, and classifying his treatment as infrequent. (Doc. 10, at 17-19).

An "ALJ is not required to accept a claimant's subjective complaints" and may "consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("we accord great deference to [the ALJ's] credibility determination."). The Sixth Circuit recently stated an ALJ's credibility findings are "virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 2013 U.S. App. LEXIS 20572, at *7, 2013 WL 5496007 (6th Cir. 2013) (quoting *Payne v. Comm'r of Soc. Sec.*, 2010 WL 4810212, at *3 (6th Cir. 2010)).

18

With this deferential framework in mind, SSR 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, at *13 (N.D. Ohio 2012).

Here, the ALJ considered Plaintiff's testimony regarding the intensity, persistence, and limiting effects of his symptoms. (Tr. 27). However, when compared with the objective medical evidence, the ALJ found his statements credible only to the extent they were consistent with the RFC. (Tr. 27).

19

In support, the ALJ pointed to Dr. Shahid's treatment notes, which revealed noncompliance issues and effectiveness of treatment. (Tr. 27). The ALJ also considered the frequency of Plaintiff's treatment, noting month-long gaps in his treatment during 2007. (Tr. 28). The ALJ further found evidence from BC which showed Plaintiff's symptoms were relieved with treatment. (Tr. 28). Additionally, the ALJ found Plaintiff's activities of daily living inconsistent with his allegations. (Tr. 25, 28).

The ALJ's credibility determination is supported by substantial evidence. With regard to noncompliance, the record clearly demonstrates that on at least two occasions, Plaintiff stopped taking Prozac on his own, and then began taking it again after his depression worsened. (Tr. 275-76, 340-41). While noncompliance can be reasonably inferred from these statements, the medical records surrounding the events in question are undeniably difficult to read. However, even setting aside the noncompliance issue, the ALJ's credibility determination is still supported by substantial evidence.

To this end, the record is riddled with evidence that Plaintiff's condition improved with medication and exercise. (Tr. 236-37, 245-46, 250-51, 253, 258, 260, 261, 263, 266-67, 273, 297-98, 301, 303, 305-06, 308-09, 336). Moreover, Plaintiff routinely reported he did not experience side effects from his medication. (Tr. 257, 260, 262, 264, 267-68, 271, 273). Additionally, Plaintiff reported participating in numerous activities of daily living, which are inconsistent with his claims regarding the persistence, pain, and limiting effects of symptoms. These included taking care of his elderly mother, driving his mother to museums and doctor appointments, reading, studying on the computer, creating a genealogy report, exercising, cooking, grocery shopping, mowing the lawn, performing yard work and home maintenance, attending church and family birthday parties, gardening, watching television, managing his

20

finances, and maintaining personal hygiene. (Tr. 47-49, 53-54, 185-92, 225, 236-37, 245, 254, 263, 265, 267, 273, 334, 432). Turning to the frequency of treatment, the ALJ indicated Plaintiff was only seen once a month over a four-month period in 2007, which is inconsistent with claims that his treatment was work preclusive. (Tr. 28). Taken together, the above supports finding the ALJ's credibility determination is supported by substantial evidence.

In his brief, Plaintiff directs the undersigned to *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807 (N.D. Ohio 2009) to argue the ALJ's "blanket assertions" of a lack of credibility will not "pass muster". (Doc. 10, at 15). In *Winning*, the ALJ's adverse credibility determination was primarily based on the claimant's testimony and her daily activities. *Id.*, at *824. However, in making that determination, the ALJ did not rely on any medical evidence or authority and did not consider the record as a whole. *Id.*, at *824-25. The court held that the ALJ's conclusory determination of incredibility, "without any evidence of elaboration or detail" was grounds for remand. *Id.* However, *Winning* is distinguishable.

Here, unlike in *Winning*, the ALJ's credibility determination was not conclusory, but was instead based on substantial evidence in the record. Indeed, he considered medical evidence in the form of Drs. Zhurakovski and Shahid's treatment records. (Tr. 27). Moreover, the ALJ considered Plaintiff's daily activities, evidence of noncompliance, and responsiveness to treatment. (Tr. 27). Finally, the ALJ considered gaps in treatment and even Plaintiff's mother's statements. (Tr. 28).  In other words, unlike in *Winning*, the ALJ in this case considered Plaintiff's record as a whole.

Of note, the ALJ considered evidence after the Plaintiff's DLI, suggesting she did not improperly rely on the fact most of the record contains treatment from after Plaintiff's DLI, as Plaintiff suggests. Plaintiff cites *Blankenship v. Bowen*, 874 F.2d 1116, 1222 (1989), which

describes how to calculate an alleged onset date. (Doc. 10, at 17-18). However, Plaintiff does not suggest the alleged onset date in this case is incorrect, rather, he argues the ALJ overemphasized the fact that most of the treatment records are outside the relevant time period. Because the relevant time period is not disputed, and because the ALJ expressly considered evidence outside the relevant time period, this argument is not well taken.

Therefore, the ALJ's credibility determination is supported by substantial evidence, namely the objective medical record, conservative treatment regimen, activities of daily living, and responsiveness to treatment. There is no "compelling" reason to disturb the ALJ's finding, thus, the undersigned recommends affirming the ALJ's credibility determination. *See Ritchie*, 2013 U.S. App. LEXIS 20572, at *7.

### *Treating Physician Rule*

Plaintiff argues the ALJ erred by affording treating physician Dr. Zhurakovski little weight, and in doing so "crafted a [RFC] that is also not based upon substantial evidence." (Docs. 10, at 19; 12, at 3).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non–treating physicians. *Rogers*, 486 F.3d at 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non–treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is [consistent] with other

22

substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Of importance, the ALJ must give "good reasons" for the assigned weight. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting *Rogers*, 486 F.3d at 243).

By citing to the relevant factors articulated in 20 C.F.R. § 404.1527(d)(2), the ALJ has satisfied the treating physician rule. The ALJ found Dr. Zhurakovski's opinion inconsistent with treatment records from 2007 with respect to the severity of Plaintiff's symptoms, frequency of treatment, and activities of daily living. (Tr. 28). The ALJ also concluded Dr. Zhurakovski's opinion was inconsistent with treatment records prior to his DLI, which demonstrated Plaintiff was responsive to recommended treatment when he was compliant with his treatment regimen. (Tr. 28). Both of these conclusions are supported by substantial evidence in the record, as explained above.

Furthermore, the ALJ pointed to inconsistencies with Plaintiff's course of treatment, pointing out Dr. Zhurakovski opined Plaintiff had been treated by BC since December 14, 2006, yet there are no treatment notes from that time. (Tr. 28, 412). Moreover, the "Initial Psychiatric Evaluation", which provided BC's earliest diagnostic assessment of Plaintiff, was not completed until January 9, 2007. (Tr. 28, 438).

Additionally, the ALJ addressed the supportability of Dr. Zhurakovski's opinion, indicating Dr. Zhurakovski opined Plaintiff was able to attend college and have meaningful employment despite his impairment and it was only his passivity and pessimism which prevented him from applying for DIB earlier. (Tr. 28, 412). In other words, Dr. Zhurakovski's own opinion is not supported by her statements.

In sum, the ALJ was under no obligation to adopt each of Dr. Zhurakovski's findings verbatim into the RFC determination. 20 C.F.R. § 404.1527(c). Moreover, she provided the necessary "good reasons" for affording Dr. Zhurakovski's opinion little weight; therefore, her conclusion is supported by substantial evidence. *See* 20 C.F.R. § 404.1527(d)(2).

### Step Five Hypothetical

Plaintiff argues the ALJ's "hypothetical questions were defective" because they failed to include all of Plaintiff's nonexertional limitations. (Doc. 10, at 20-21).

To meet his burden at step five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to

24

provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec*., 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs*., 987 F.2d 1230, 1235 (6th Cir. 1993).

Plaintiff urges the Court to find the ALJ erred because she did not rely on the VE's response to a hypothetical which included Dr. Zhurakovski's opinion that Plaintiff could understand, remember, and carryout short, simple instructions only between one-third and two-thirds of an eight-hour workday, follow work rules and use judgment for work-related decisions only up to one-third of an eight-hour workday, and would miss five or more workdays per month. (Docs. 10, at 20; 12, at 5).

However, the ALJ relied on a hypothetical question that fairly set out all of Plaintiff's limitations. Indeed, the ALJ relied on VE testimony in response to a hypothetical that included restrictions related to climbing, exposure to moving machinery and unprotected heights, vision, pace, production, simple and routine tasks, work place changes, and interaction with the public, coworkers, and supervisors. (Tr. 26, 58-59). In response, the VE opined work was available for such a person as an automobile detailer, floor waxer, and industrial cleaner. (Tr. 30).

As noted above, the ALJ properly analyzed Plaintiff's credibility and had good reasons for affording Dr. Zhurakovski's opinion little weight. Therefore, she was justified in including,

and eventually adopting, only those limitations she accepted as credible into the hypothetical and RFC determination. *Casey*, 987 F.2d at 1235.

Plaintiff points to *Bielat v. Comm'r of Soc. Sec.*, 267 F. Supp. 2d 698, 701-02 (E.D. Mich. 2003) to argue vague hypothetical questions are criticized by the court. (Doc. 10, at 21). In *Bielat*, the court held remand was appropriate because the ALJ's hypothetical limited the plaintiff to unskilled sedentary work yet did not account for all of the nonexertional impairments that were incorporated into his RFC. *Id.* at 701. However, the facts of this case are distinguishable because here, the ALJ's hypothetical referenced all of Plaintiff's nonexertional limitations included in his RFC.

The ALJ reasonably accepted the VE's response to a hypothetical question that included all of Plaintiff's credibly established functional limitations. Because the VE responded to a correctly formulated hypothetical, the expert's response that the claimant is capable of performing jobs that exist in the national economy in significant numbers constitutes substantial evidence to support the ALJ's "no disability" ruling. Accordingly, the ALJ satisfied her burden at step five.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of

Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).