IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Gary E. Baumbach,           Case No. 3:12CV2860

      Plaintiff

      v.           **ORDER**

Carolyn W. Colvin,
      Acting Commissioner of Social Security,

      Defendant

The Social Security Administration (SSA) denied plaintiff Gary E. Baumbach's claim for disability insurance benefits. Plaintiff appealed to this court, 42 U.S.C. § 405(g), and the Magistrate Judge filed a Report and Recommendation (R&R) concluding that I should affirm the Commissioner' decision. (Doc. 14). Plaintiff filed timely objections. (Doc. 15).

For the following reasons, I respectfully reject the Magistrate Judge's R&R, sustain plaintiff's objections in part, and remand this case to the Commissioner.

### Background

This order assumes familiarity with the factual and procedural background of this case, which the R&R sets forth in detail. In brief, plaintiff is a sixty-five-year-old man with a long history of mental-health problems. He has a Bachelor of Science degree in geology and has completed some post-graduate courses. Plaintiff has worked as a hydrological engineer for the U.S. Geological Survey, a computer technician, and a sales clerk at Radio Shack.

Plaintiff applied for benefits in September, 2008, alleging that, as of October, 2001, he was disabled on account of bipolar disorder, major depression, and vision problems. His date last insured for benefits (DLI) was December 31, 2006.

### A. Plaintiff's Mental Health

Between February, 2001, and December, 2006, Dr. Agha Shahid was plaintiff's treating psychiatrist. Dr. Shah's notes, which are mostly illegible, reflect that plaintiff's condition improved while he was on Prozac. Additional notes show that plaintiff occasionally (though perhaps only once) stopped taking Prozac because of its deleterious effect on his mood, appetite, and sleeping patterns. (Doc. 14 at 3).

In mid-December, 2006, or early January, 2007, plaintiff began receiving treatment at Behavioral Connections, a free mental-health clinic in Wood County, Ohio. After an initial examination, doctors at the clinic determined that plaintiff suffered from major depressive disorder, recurrent.

Dr. Molitor, on staff with Behavioral Connections, performed a more thorough evaluation and diagnosed plaintiff with bipolar disorder, Type II. Molitor also assigned plaintiff a GAF score (global assessment of functioning score) of 40. According to the *Diagnostic & Statistical Manual of Mental Disorders*, that score signified that plaintiff had either "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood[.]" (Doc. 14 at 4).

Dr. Molitor's treatment notes reflect that he consistently diagnosed plaintiff with bipolar disorder throughout 2007.

In January, 2008, plaintiff began seeing Dr. Galina Zhurakovski, another doctor at Behavioral Connections. Like Dr. Molitor, Dr. Zhurakovski "consistently diagnosed plaintiff with bipolar disorder, type II[.]" (*Id.*). While under Zhurakovski's care in 2008 and early 2009, plaintiff complained of mood swings, fatigue and agitation, and trouble sleeping. At the same time, he reported that exercise and medication (including Prozac) made him feel better.

In September, 2009, W.J. Timmermann, a doctor with the Bureau of Vocational Rehabilitation, administered a vocational examination. He found that, although plaintiff had normal to above-average intelligence, his communication and social skills were limited.

In late November, 2009, Dr. Zhurakovski prepared a mental-health evaluation for the Bureau of Disability Determination (BDD). Zhurakovski opined that plaintiff could understand, remember, and follow directions, but had "severely limited executive functioning skills, low level[s] of motivation and energy, dysphonic mood, reserved affect, difficulty concentrating, and persistent psychomotor retardation." (Doc. 14 at 7).

Plaintiff continued to see Dr. Zhurakovski on a biweekly basis from June, 2010, through February 1, 2011.

Meanwhile, in December, 2009, Melanie Bergsten, a psychiatrist with the BDD, reviewed plaintiff's file. She concluded that plaintiff had bipolar disorder, but that there was "insufficient evidence" to determine how severely that impairment limited plaintiff's daily activities, his ability to concentrate, and his social skills. (Doc. 9 at 402).

In April, 2010, another doctor with the BDD, Frank Orosz, confirmed Bergsten's findings. He noted, *inter alia*, that plaintiff claimed to suffer from bipolar disorder and depression, but that "[t]here is insufficient evidence for the relevant time period." (*Id.* at 414).

3

## B. The ALJ's Decision

After a hearing, an administrative law judge (ALJ) found that plaintiff "was not under a disability . . . from October 1, 2001, through the date last insured" and denied his claim for benefits. (Doc. 9 at 26).

As relevant here, the ALJ concluded that plaintiff's impairments did not meet or equal Listing 12.04, which defines disabling affective disorders. Although the ALJ deemed plaintiff's bipolar disorder and depression to be severe impairments, she concluded that the impairments caused only "mild" or "moderate" limitations in plaintiff's daily activities, social functioning, and "concentration, persistence or pace[.]" (*Id.* at 29).

The ALJ then found that plaintiff had the residual functional capacity (RFC) to perform "simple, routine, and repetitive tasks" that involved nothing beyond "simple" decision-making skills. (*Id.* at 30). She also concluded that plaintiff's work must be "isolated from the public" and subject to "only occasional supervision and only occasional interaction with coworkers." (*Id.*).

Given that RFC, the ALJ concluded that plaintiff could find work as a car detailer, a floor waxer, or an industrial cleaner.

In defining plaintiff's RFC, the ALJ rejected Dr. Zhurakovski's opinion that plaintiff's functional limitations were severe enough to preclude him from performing any work at all. According to the ALJ, Zhurakovski's opinion was inconsistent with the evidence respecting "the severity of symptoms, course of treatment, frequency of treatment, and activities of daily living." (*Id.* at 32).

**Discussion**

In social security cases, the Commissioner determines whether a claimant is disabled and entitled to benefits. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). My review "is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Id.*

Substantial evidence is evidence that a reasonable mind would accept to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely*, *supra*, 581 F.3d at 406. At the same time, whether substantial evidence supports the ALJ's decision is a question that must be answered in light of "the record taken as a whole." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984). Thus, substantial evidence is "not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.*

Because plaintiff has filed an objection, I will conduct a de novo review of those parts of the R&R to which he has objected. 28 U.S.C. § 636(b)(1).

**A. Request for Medical Expert Testimony**

Plaintiff first objects that the ALJ abused her discretion by not calling a Medical Expert to testify. Plaintiff notes that the state agency consultants who reviewed his file in 2009 and 2010 lacked sufficient evidence to opine on the severity of his functional limitations. He then argues that,

in the absence of a "state agency opinion as to the listings, the ALJ . . . should have found well taken the request for [a medical expert's] testimony." (Doc. 15 at 3).[1]

Ordinarily, the decision whether to consult a medical expert is left to the ALJ's discretion. *Zelenak v. Comm'r of Soc. Sec.*, 2013 WL 5952201, *6 (N.D. Ohio).

There are, however, two circumstances in which an ALJ must call on a medical expert to provide an updated opinion: when "(1) there is evidence of symptoms, signs and findings that suggest to the [ALJ] . . . that the applicant's condition may be equivalent to the listings; or (2) when additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding that the impairment does not equal the listings." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 830 (6th Cir. 2009); *see also* Social Security Ruling 96-6p, 1996 WL 274180, *3.

Plaintiff's objection implicates the second exception: here, the ALJ received "additional medical evidence" – Dr. Zhurakovski's February, 2011, report (Doc. 9 at 416-419) – that was not available to the state agency consultants who reviewed plaintiff's case.

But the bare submission of new medical evidence does not trigger the ALJ's duty to consult with a medical expert. Rather, that duty arises only if the ALJ concludes that the evidence "may change the State agency . . . consultant's finding that [plaintiff's] impairment does not equal the listings." *Kelly*, *supra*, 314 F. App'x at 830.

Accordingly, the resolution of plaintiff's first objection turns on the weight the ALJ gives to the new evidence. Here, the ALJ determined that Dr. Zhurakovski's opinion was entitled to "little

---

[1] The Commissioner filed a response that does not directly address plaintiff's objections. It merely asserts that the Magistrate Judge correctly determined that the ALJ's decision should be affirmed.

6

weight" because, *inter alia*, it was inconsistent with plaintiff's treatment records from both the pre- and post-DLI periods. (Doc. 9 at 32).

Because the ALJ's decision implies that she did not believe that Zhurakovski's opinion would have affected the state agency consultants' findings, the ALJ was not required to call a medical expert. *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 724 (6th Cir. 2012) (ALJ did not err in failing to seek updated expert opinion where, "in light of [the ALJ's] determination that the [new evidence] did not save Claimant's claim, he implicitly decided that [the new evidence] would not change the opinions of the experts").

Although the medical-expert issue does not, standing alone, warrant a remand, the ALJ's handling of Dr. Zhurakovski's opinion does. As I explain below, no substantial evidence supports the ALJ's decision to reject Zhurakovski's opinion on the grounds cited in the ALJ's written decision.

Because of the interrelationship between the weight given to Zhurakovski's opinion and the decision whether to consult with a medical expert, the ALJ must, on remand: 1) consider whether to consult with a medical expert; and 2) if the ALJ determines that a medical expert is not needed, she must give reasons for that decision.[2]

### B. Treating Physician Rule

Plaintiff's second objection is that the ALJ violated the treating-physician rule when, in crafting his RFC, she rejected Dr. Zhurakovski's opinion regarding the severity of plaintiff's functional limitations.

---

[2] Although plaintiff's pre-hearing brief urged the ALJ to consult with a medical expert (Doc. 9 at 145-146), the ALJ did not acknowledge or resolve that request.

"Under the treating physician rule, an ALJ generally must give greater deference to the opinions of treating physicians than those of other physicians." *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 818 (N.D. Ohio 2009).

"Treating-source opinions must be given controlling weight if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

"When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider . . . the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).

If the ALJ decides to discount the treating-physician's opinion, she must give "good reasons" for doing so. Social Security Ruling 96-2p, 1996 WL 374188, *5. These reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion." *Blakely*, *supra*, 581 F.3d at 406-407.

### 1. Dr. Zhurakovski's Opinion

Here, the record contains the opinion of only one treating source: Dr. Zhurakovski, who opined in February, 2011, that plaintiff's bipolar disorder and depression precluded him from performing any substantial gainful activity. Although the report is dated long after plaintiff's DLI,

8

it examined plaintiff's impairments as of mid-January, 2007, little more than two weeks after the DLI.

Dr. Zhurakovski opined that, as of January, 2007, plaintiff's bipolar disorder and depression caused moderate functional limitations in eight areas: 1) understanding, remembering, and executing simple instructions; 2) using judgment to make simple, work-related decisions; 3) following work rules; 4) interacting with the public; 5) interacting appropriately with supervisors; 6) interacting appropriately with coworkers; 7) maintaining his appearance; and 8) behaving in an emotionally appropriate manner. (Doc. 9 at 417-418).

Zhurakovski further opined that plaintiff had marked limitations when it came to, *inter alia*, relating predictably in social setting and responding appropriately to work-related stress and changes in a routine work environment. (*Id.*).

In light of those limitations, Zhurakovski concluded that plaintiff could reasonably be expected miss "5 or more days" of work per month. (*Id.* at 418).[3]

At the administrative hearing, plaintiff's lawyer asked the vocational expert a hypothetical question about a claimant with the limitations Dr. Zhurakovski ascribed to plaintiff. The VE responded that such an individual could not perform any work at all. (*Id.* at 63, 68-69).

## 2. The ALJ's Analysis

The ALJ determined that Dr. Zhurakovski's opinion was entitled to "little weight" because it was inconsistent with the evidence concerning plaintiff's "symptoms, course of treatment, frequency of treatment, and activities of daily living," none of which "demonstrate[d] symptoms so

---

[3] By 2011, Dr. Zhurakovski found that plaintiff's bipolar disorder had imposed more severe limitations. Whereas plaintiff formerly had moderate limitations in most functional areas, in 2011 plaintiff's limitations were generally marked or extreme. (*Id.* at 418-419).

crippling that they precluded [plaintiff] from performing all work activity at SGA levels." (Doc. 9 at 32).

She further determined that Zhurakovski's opinion was inconsistent with plaintiff's treatment records, which showed that plaintiff: 1) responded well to medication; but 2) did not always comply with doctor's orders to take Prozac.

For the reasons set forth below, the ALJ's decision to reject Zhurakovski's opinion on those grounds is not supported by substantial evidence.

### i. Frequency of Treatment

One problematic component of the ALJ's decision is her apparent conclusion that the frequency of plaintiff's treatment at Behavioral Connections was inconsistent with the limitations Zhurakovski attributed to him.

The record establishes that plaintiff received treatment at Behavioral Connections seven times between January and November, 2007. (Doc. 15 at 6). In 2008, Zhurakovski treated plaintiff fourteen times. (*Id.*). Plaintiff then saw Dr. Zhurakovski on a biweekly basis from mid-June, 2010, through mid-February, 2011.

It would be difficult to characterize this treatment record as sporadic or infrequent.[4] Nevertheless, the ALJ appears to have assumed that, had plaintiff's symptoms and functional limitations been as severe as Zhurakovski claimed, plaintiff would have received even more care at Behavioral Connections.

---

[4] Indeed, plaintiff received far more treatment from Dr. Zhurakovski and others at Behavioral Connections than from Dr. Shahid.

But the ALJ's assumption is just that: an assumption, entirely unmoored from the evidentiary record. In so assuming, moreover, the ALJ violated Social Security Ruling 96-7p, which prohibited her from drawing inferences from the frequency of plaintiff's treatment without asking him for an explanation:

> [T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

*Couch v. Comm'r of Soc. Sec.*, 2012 WL 930864, *4 (S.D. Ohio).

Accordingly, no substantial evidence in the record supports the ALJ's decision to reject Dr. Zhurakovski's opinion on frequency-of-treatment grounds.

### ii. Daily Activities

Even more problematic is the significance that the ALJ attached to plaintiff's daily activities, such as his ability to "cook, go grocery shopping and perform chores . . . drive and g[e]t out of his house about two times per week[,] and "drive his mother to doctor appointments." (Doc. 9 at 29).

Before examining some of the ALJ's findings on that score, I note two fundamental problems that skewed her analysis from the outset.

First, there is no suggestion that the ALJ viewed the evidence respecting plaintiff's daily activities with an eye toward determining whether plaintiff "could do any of these activities on a *sustained* basis, which is how the functional limitations of mental impairments are to be assessed."

11

*Gayheart*, *supra*, 710 F.3d at 377 (citing 20 C.F.R. § 404.1520a(c)(2) & 20 C.F.R. Part 404, Subpart P., App. 1, at 12.00) (emphasis in original).

On the contrary, it appears that the ALJ merely counted up the activities plaintiff had performed and deemed them sufficient to undermine Dr. Zhurakovski's opinion. That mode of analysis is inconsistent with *Gayheart* and the applicable regulations, which require that the Commissioner measure the severity of a claimant's limitations not by "a specific number of different activities of daily living" – as the ALJ did here – but rather by "the nature and overall degree of interference" that the claimant's impairment causes. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(C)(1).

Second, it is unclear how the ALJ determined that plaintiff's capacity to engage in minimal daily activities translated in a capacity to perform substantial gainful activity. As the Sixth Circuit has observed in similar circumstances, "these somewhat minimal daily functions are not comparable to typical work activities." *Rogers*, *supra*, 486 F.3d at 248.

Indeed, while the ALJ appeared to recognize the evidence that plaintiff's mental-health issues would pose problems in the workplace, she did not try to reconcile that evidence with her decision discrediting Zhurakovski's opinion. For example, the ALJ acknowledged that plaintiff "has difficulties being around other people and interacting with coworkers." (Doc. 9 at 29). However, she seemed to assume, without any explanation, that these difficulties would not be an obstacle at work, because plaintiff "lived with his parents" and "attend[ed] family gatherings for such events as birthdays." (*Id.*).

Likewise, the ALJ recognized that plaintiff had "difficulties completing tasks." (*Id.*). But she rejected Dr. Zhurakovski's opinion because plaintiff had "assisted his parents" with occasional tasks

and chores around the house. (*Id.*). Absent an explanation from the ALJ how those activities support plaintiff's ability to perform substantial gainful activity, the ALJ's decision lacks substantial evidentiary support.

Even if I could set aside the structural flaws in the ALJ's analysis, I would still conclude that no substantial evidence supports her decision to discredit Dr. Zhurakovski's opinion on the basis that plaintiff could perform some daily activities. At first blush, these findings appear consistent with the ALJ's decision. On further examination, however, it is apparent that other evidence in the record undermines or offsets those findings.

For example, the ALJ observed that plaintiff left his house "about two times per week." (*Id.*). The significance of this testimony is unclear, however, given plaintiff's equivocal testimony at the administrative hearing. He testified that, from 2001 forward, he left the house "[j]ust probably [for] church and – I don't know. What was the question again?" (*Id.* at 52). When the ALJ re-asked the question, plaintiff responded, "most of the time, [I] just didn't feel like going anywhere . . . Church and that was probably about it." (*Id.*). Only when pressed a fourth time (and in a leading manner) did plaintiff agree that he made "probably two" trips out of the house per week. (*Id.*).

Furthermore, although plaintiff may have left home from time to time, the record reflects that he had no hobbies, belonged to no clubs or organizations, and did not socialize with anyone other than family members. Although this evidence signifies plaintiff's difficulties engaging with other people in organized settings, the ALJ did not discuss it in her written opinion.

The ALJ also noted that plaintiff drove his mother to her doctor's appointments.[5] Cutting against the probative value of that evidence, however, is plaintiff's testimony that he has great

---

[5] The ALJ did not pinpoint the frequency with which plaintiff did so.

difficulty navigating to new locations, and that memory problems give him "trouble remembering from one minute to the next what [he has] read [on the map] before." (Doc. 9 at 56).

And while the ALJ found that plaintiff was able to cook, that finding has little if any force: plaintiff's cooking was limited to making sandwiches, opening canned food, and preparing frozen food. (*Id.* at 186).

These examples illustrate some of the ways in which the ALJ failed to assess the record as a whole when rejecting Dr. Zhurakovski's opinion. Given that error – and the ALJ's failure to determine whether plaintiff could perform daily activities on a sustained basis and explain how his daily activities translated into an ability to perform substantial gainful activity – the ALJ's decision does not rest on substantial evidence.

### iii. Noncompliance Issues and Severity of Plaintiff's Symptoms

The ALJ also declined to credit Dr. Zhurakovski's opinion because she believed it inconsistent with plaintiff's treatment records, which showed "noncompliance issues." (Doc. 9 at 31). According to the ALJ, plaintiff stopped taking Prozac even though "his symptoms were less severe and he reported feeling better" while on that medication. (*Id.*).

#### a). Treatment from Dr. Shahid

Here, to the extent plaintiff's treatment notes are legible, they reflect that plaintiff discontinued Prozac only infrequently, and only because of adverse side effects. According to Dr. Shahid's notes, plaintiff more often than not reported no side effects from the Prozac. (Doc. 10 at 16). Consequently, Shahid maintained plaintiff on Prozac and introduced other medications. (*Id.*).

In November, 2006, however, plaintiff told a different doctor[6] that he had felt "poorly for many months." (Doc. 9 at 345). Plaintiff also said that he was "getting angry/irritable," and that he stopped taking Prozac because he thought it was responsible for his mood problems. (*Id.*). After stopping Prozac, plaintiff "felt better for awhile," but soon fell into a "profound depression." (*Id.*). At that time, plaintiff was taking a different drug – Celexa – but still experienced appetite problems, a general malaise, and discomfort in his chest. (*Id.*).[6]

In mid-December, 2006, Dr. Shahid adjusted plaintiff's medications again by, *inter alia*, re-introducing Prozac. Plaintiff thereafter reported that he was "already feeling better," though he also appeared "morose/tense/not very verbal." (Doc. 9 at 344).

Contrary to the ALJ's determination, this evidence does not demonstrate "noncompliance issues." (Doc. 9 at 31). On the contrary, the evidence shows that: 1) plaintiff stopped taking Prozac to alleviate what he perceived to be deleterious side effects; and 2) Dr. Shahid validated plaintiff's actions, at least in part. Indeed, Dr. Shahid prescribed plaintiff Celexa and other drugs in light of his difficulties with Prozac. (*Id.* at 279).

Despite the relevance of this evidence to the noncompliance issue, the ALJ did not acknowledge it, let alone explain how it was consistent with her opinion that plaintiff was a noncompliant patient. For that reason, and in light of the record as a whole, it was unreasonable for the ALJ to disregard Zhurakovski's opinion on noncompliance grounds.

---

[6] Dr. Sydney O. Fernandes, whom plaintiff saw "for reasons generally immaterial" to his mental-health issues. (Doc. 14 at 3).

[6] Plaintiff represents (Doc. 10 at 16), and the record tends to confirm, that Dr. Shahid prescribed Celexa for plaintiff. At the time plaintiff took Celexa, Shahid was his only psychiatrist.

### b). Treatment at Behavioral Connections

Nor can I accept the ALJ's finding (Doc. 9 at 31-32) that plaintiff's treatment records at Behavioral Connections undermine Dr. Zhurakovski's opinion.

The ALJ observed that, when plaintiff first visited the clinic in January, 2007, he was: 1) not taking Prozac; and 2) diagnosed with bipolar disorder and major depressive disorder. She then found that plaintiff had only a "slightly depressed" mood once he resumed Prozac (and started taking other medications. (*Id.* at 31). The ALJ conceded that these records were silent on "specific work limitations attributable to [plaintiff's] severe impairments," but she nevertheless determined that the records "do not demonstrate a level of severity that would have precluded all competitive work[.]" (*Id.* at 31-32).

In so concluding, the ALJ appears to have assumed that, once plaintiff resumed Prozac in 2007, his mental-health problems were unlikely to have caused the severe functional limitations reported by Dr. Zhurakovski.

The ALJ's analysis on that score lacks substantial support in the record. For one thing, the ALJ did not account for the fact that, regardless of plaintiff's medication regimen, doctors at Behavioral Connections consistently diagnosed him with bipolar disorder, and not as presenting only with a "slightly depressed" mood. For another, Dr. Zhurakovski's treatment notes and her February, 2011, evaluation reflect that plaintiff's limitations worsened over time – a fact that suggests adjusting plaintiff's medication was insufficient to control or alleviate his symptoms.

Because the ALJ did not grapple with this evidence in opining on the severity of plaintiff's functional limitations, her decision does not rest on substantial evidence.

### 3. Remedy

Despite the lack of substantial evidence supporting the ALJ's decision, plaintiff has not convinced me that directing an award of benefits is the appropriate course of action. Rather, I will remand this case to the Commissioner for proceedings consistent with this order.

In this regard I note that the primary flaw in the ALJ's decision is the failure to evaluate the evidence concerning plaintiff's functional limitations in light of the record as a whole and, more importantly, in light of the relevant regulations and Social Security rulings. This is the type of error that is susceptible of correction on remand.

### Conclusion

For the reasons set forth above, it is

ORDERED THAT

1. Plaintiff's objections (Doc. 15) to the Magistrate Judge's Report and Recommendation be, and the same hereby are sustained in part and overruled in part;

2. The Commissioner's decision be, and the same hereby is vacated; and

3. This case is remanded to the Commissioner for further proceedings consistent with this order.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge